THE PEOPLE ex rel. VALERIA STAPLES, Plaintiff-Appellee, v. FLOYD PRUDE, Defendant-Appellant.

(No. 58645; ▓▓▓▓▓▓▓▓▓▓)

First District (3rd Division)—March 7, 1974.

Gates W. Clancy and James S. Mills, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Donald P. Smith, Assistant State's Attorney, of counsel), for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This is a paternity case. The defendant, Floyd Prude, appeals from a judgment which found him to be the father of a child born to the plaintiff, Valeria Staples. His contentions are two: the judgment of paternity was contrary to the weight of the evidence, and the trial court violated his right against self-incrimination by ordering him to answer interrogatories propounded by the plaintiff.

Valeria Staples, a divorcee since 1965, testified that she first met Floyd Prude in December 1969, after Christmas. She related that she first had

sexual intercourse with him prior to January 1, 1970, in her apartment, and that they continued to meet and have intercourse almost daily from that time until the first week in February. She did not see him afterwards, but telephoned him in May 1970 to inform him that she was pregnant. She explained that her delay in telling him was because she wanted to be certain of her condition. The baby was born November 21, 1970, delivered by Doctor Sidney Lash. It was the uncontested testimony of the plaintiff that the doctor told her the child was about three weeks overdue. She denied engaging in sexual relations with anyone except Prude between December 26, 1969, and February 15, 1970.

On cross-examination, the plaintiff was shown copies of the baby's birth and baptismal certificates, each of which bore different names of the putative father. The birth certificate named "Herschel Staples" as the father. The plaintiff explained that when she checked into the hospital to deliver the baby she was asked her marital status and responded "divorced." She was then asked the name of her ex-husband and replied "Horatio Staples." According to her story, the hospital then entered a variation of that name when it later completed the birth certificate, without further questioning her. The baptismal certificate named "Floyd Staples" as the father. She explained that when she was preparing to have the child baptized she was asked the first name of the father and she answered "Floyd"; she volunteered nothing further because of her embarrassment over the child's illegitimacy.

Diane Marsalis, a witness for the plaintiff, testified that she knew Floyd Prude, having first met him in January 1970, when he visited her apartment with Valeria Staples, whom she had known many years. She saw them together again in late January or early February, and she spent an evening in their company at a friend's birthday party. She stated that Floyd left the party with Valeria.

Barbara Prude, wife of Floyd Prude, testified that she married the defendant in December 1970 and that in January or February of 1971 Valeria Staples approached her in a cocktail lounge and, in the presence of her husband, told Barbara he was the father of Valeria's child and that she wished payment to help raise the infant. Barbara said she rejected Valeria's claims, despite the latter's threat to make trouble for Floyd by taking him to court if no formal settlement could be worked out.

The only other defense witness was the defendant himself. He admitted his acquaintance with Valeria Staples, but only for the period from September to December 1969. He could not recall the number of times he had intercourse with her in those months, although he believed them to be few. Likewise, he was uncertain of the date of his final visit

but was certain that it had been no later than December 15 and was equally positive that he had no intercourse with her in December. He said he did not hear from her again until May 1970, when she telephoned to inform him of her pregnancy, and did not see her again until January 1971 when she confronted him and his wife.

The defendant, in support of his contention that the paternity finding was against the weight of the evidence, alludes to several claimed weaknesses in the State's case: first, there was no medical evidence that the child was delivered three weeks past the normal term of pregnancy; second, the long delay in informing him of the pregnancy and in bringing this action; third, the plaintiff's failure, for a considerable period of time, to name the father to anyone except two close members of her family, and, fourth, her failure to name him as the father on the birth and baptismal certificates.

■■ In a paternity case, the burden of persuasion rests on the plaintiff to prove the charge by a preponderance of the evidence. Where the case is tried without a jury it is for the trial judge to determine the credibility of the witnesses and the weight of testimony, and if the defendant's testimony contradicts that of the plaintiff, the judge may choose to believe one party and not the other. (*In re Blackwell v. Welti* (1964), 46 Ill.App.2d 453, 197 N.E.2d 126.) An appellate court will reverse a trial court on the question of evidence only if it is clearly convinced that the result is contrary to the manifest weight of the evidence. *People ex rel. Dalman v. O'Malley* (1963), 43 Ill.App.2d 95, 192 N.E.2d 589.

■■ After reviewing the record, we cannot say that we are clearly convinced a mistaken conclusion was reached by the trial court. Although the only testimony about the lateness of the baby's arrival was from the mother, the hearsay testimony went unchallenged by counsel for the defendant. Moreover, no effort was made to impeach her assertion, despite the availability of hospital records and the delivering physician. Her delay in telling the defendant of her condition was plausibly explained by her desire to be certain she was pregnant before contacting him. Her failure to spread his name about, and the different names entered on the birth and baptismal certificates, were understandably related to her embarrassment and the concomitant reluctance to reveal more to anyone than she felt to be absolutely necessary.

The principal clash in the parties' testimony relates to the dates of their intimacy. Prude claimed that he last had intercourse with the plaintiff in November 1969, while she stated the final date was in the first week of February 1970. Since Prude did admit to the relationship, quarreling only as to dates, and since the plaintiff produced a cor-

roborating witness who saw her with him in late January 1970, the trial judge had an additional basis when assessing credibility to believe the plaintiff and disbelieve the defendant.

During discovery proceedings antecedent to the trial, Prude was required to answer interrogatories over his objection that to do so would violate his constitutional privilege against self-incrimination. The queries to which he objected related to the time span and frequency of his sexual intimacies with the plaintiff. His answers admitted having intercourse with her from September through November 1969. He complains that his answers could furnish a link in the chain of evidence necessary to prosecute him criminally for fornication or public indecency. Ill. Rev. Stat. 1969, ch. 38, pars. 11—8 and 11—9.

■■ The defendant's complaint is academic. The question is not whether his fifth amendment right was violated, but whether the violation—if there was one—deprived him, or contributed to deprive him, of a fair trial. Neither the interrogatories nor the answers affected the outcome of his trial; no attempt was made to introduce them into evidence and they were not used for impeachment purposes. Moreover, the incriminating revelations of which he complains were freely related by him at the trial. His failure to assert the privilege against self-incrimination when he was questoned, waived the privilege. *People v. Rimicci* (1968), 97 Ill.App.2d 470, 240 N.E.2d 195.

The judgment is affirmed.

Affirmed.

McNAMARA, P. J., and McGLOON, J., concur.